JOHN C. CRUDEN, Assistant Attorney General
SETH M. BARSKY, Chief
MEREDITH L. FLAX, Assistant Section Chief
NICOLE M. SMITH, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0368
Fax: (202) 305-0275
E-mail: nicole.m.smith@usdoj.gov

*Attorneys for Federal Defendants*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MONTANA

# BUTTE DIVISION

|  |  |  |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.* | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2:15-cv-00004-BU-SHE |
| v. | ) ) | |
| S.M.R. JEWELL, *et al.*, | ) ) | **FEDERAL DEFENDANTS' BRIEF IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT** |
| Defendants, | ) ) | |
| and | ) ) | |
| STATE OF MONTANA, *et al.*, | ) ) | |
| Defendant Intervenors. | ) ) ) | |

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.   INTRODUCTION ...................................................................................1

II.  STATUTORY BACKGROUND .............................................................2

III. FACTUAL BACKGROUND...................................................................4

IV.  STANDARD OF REVIEW.....................................................................5

V.   ARGUMENT...........................................................................................6

  A.  FWS Reasonably Decided Not to List the Grayling
     DPS. ....................................................................................................6

  B.  FWS' 2014 Decision is Appropriately Based on a New
     Administrative Record...........................................................................9

  C.  Federal Defendants are Entitled to Judgment on
     Count I. ..............................................................................................11

  D.  Federal Defendants are Entitled to Judgment on
     Count II. .............................................................................................12

    1.  FWS' Population Findings Were Not Arbitrary .........................12

    2.  FWS' Analysis of Genetic Diversity Was Reasonable..............15

    3.  FWS Rationally Concluded that Stochastic Events Were
       Not Threats. ...............................................................................16

  E.  Federal Defendants are Entitled to Judgment on
     Count III. ...........................................................................................18

    1.  FWS' Streamflow and Temperatures Analyses Were
       Rational......................................................................................18

    2.  FWS Properly Considered the CCAA Under Factor A. .............20

i

3.  FWS Rationally Evaluated the Threat of Climate Change. ........................23

F.  Federal Defendants are Entitled to Judgment on
Count IV. ..................................................................................................25

VI.  CONCLUSION ...............................................................................................29

# TABLE OF AUTHORITIES

## CASES                                                           PAGE

*Bennett v. Spear*,
  520 U.S. 154 (1997).................................................................6

*Chevron U.S.A. v. Natural Res. Def. Council*,
  467 U.S. 837 (1984)....................................................... 21, 26

*Colorado River Cutthroat Trout v. Salazar*,
  898 F. Supp. 2d 191 (D.D.C. 2012)....................................21

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
  2007 WL 716108 (D. Colo. Mar. 7, 2007).........................21

*Defenders of Wildlife v. Babbitt*,
  1999 WL 33537981 (S.D. Cal. June 14, 1999)...................21

*Defenders of Wildlife v. Jewell*,
  815 F.3d 1 (D.C. Cir. 2016)......................................... 21, 22

*Defenders of Wildlife v. Norton*
  258 F.3d 1136 (9th Cir. 2001) ...........................................26

*Defenders of Wildlife v. Salazar*,
  729 F. Supp. 2d 1207 (D. Mont. 2010)..............................27

*Federal Communications Commission v. Fox Television Stations*,
  556 U.S. 502 (2009)............................................. 10, 11, 12

*Greater Yellowstone Coalition v. Servheen*,
   665 F.3d 1015 (9th Cir. 2011) .......................................... 24

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
  378 F.3d 1059 (9th Cir. 2004) ...........................................16

*Greenpeace Action v. Franklin*,
  14 F.3d 1324 (9th Cir. 1992) .............................................20

*Kern Cnty. Farm Bureau v. Allen*,
    450 F.3d 1072 (9th Cir. 2006) ..............................................................14

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ............................................ 6, 8, 16, 20

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v.*
    *Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ..............................................................20

*Nat'l Cable & Telecomm'n Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005)............................................................................26

*San Luis & Delta–Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ..........................................................6, 12

*Sierra Club v. Bureau of Land Mgmt.*,
    786 F.3d 1219 (9th Cir. 2015) ............................................................10

*Tucson Herpetological Society v. Salazar*,
    566 F.3d 870 (9th Cir. 2009) .............................................................. 19

*WildEarth Guardians v. Jewell*,
    2015 WL 5770537 (D. Ariz. Sept. 8, 2015) ........................... 25, 26, 28

## STATUTES

5 U.S.C. §§ 702....................................................................................5
16 U.S.C. §§ 1531 ................................................................................1
16 U.S.C. § 1532(6) .............................................................................6
16 U.S.C. § 1532(15) ...........................................................................2
16 U.S.C. § 1533(a)(1)..........................................................................2
16 U.S.C. § 1533(a)(1)(A) ............................................................. 18, 22
16 U.S.C. § 1533(a)(1)(D) ..................................................................11
16 U.S.C. § 1533(a)(1)(E)....................................................................12
16 U.S.C. § 1533(b)(3)(A)...................................................................22
16 U.S.C. § 1533(b)(3)(C)(i) ................................................................ 9
16 U.S.C. § 1533(b)(3)(B)(ii) ......................................................... 3, 9
16 U.S.C. § 1533(c)(1)........................................................................27

33 U.S.C. § 1251 ............................................................................................7

## **FEDERAL REGULATIONS**

50 C.F.R. § 424.11(f) ....................................................................................21
50 C.F.R. § 424.14 ..........................................................................................3
50 C.F.R. § 424.16(c)(2) .................................................................................3
68 Fed Reg. 15100 (Mar. 28 2003) .............................................................. 21
75 Fed. Reg. 54708 (Sept. 8, 2010) ...............................................................4
79 Fed. Reg. 37578 (July 1, 2014) ............................................................... 25
79 Fed. Reg. 49384 (Aug. 20, 2014) ..............................................................1

## I.     INTRODUCTION

Plaintiffs challenge a determination by the U.S. Fish & Wildlife Service ("FWS") that listing the Upper Missouri River distinct population segment ("DPS") of Arctic grayling as "endangered" or "threatened" under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq*, is not warranted. 79 Fed. Reg. 49384 (Aug. 20, 2014) ("2014 Finding").  FWS concluded, based on the best available scientific and commercial information available, that 19 of 20 grayling populations within the DPS were either stable or increasing, which demonstrates that habitat-related threats have been sufficiently ameliorated and that the DPS does not qualify for listing under the Act.

As an expert agency charged by Congress with implementing the ESA, FWS' exercise of judgment in a technical area within its special area of expertise is entitled to substantial deference.  Here, Plaintiffs have not met their burden to show that the agency's action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  Instead, Plaintiffs merely ask this Court to substitute their judgment and views for that of the agency.  This, the Court may not do.  FWS' rational listing decision should be upheld.

## II.   STATUTORY BACKGROUND

Section 4 of the ESA directs the Secretary of the Interior[1] to determine

which species should be listed as endangered or threatened under the Act, based on

the following factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1); *see also id*. at § 1532(6), (20) (definitions of endangered

and threatened species).  Listing determinations must be made "solely on the basis

of the best scientific and commercial data available ... after conducting a review of

the status of the species and after taking into account those efforts, if any, being

made by any State or foreign nation ... to protect such species ..." *Id*. § 1533

(b)(1)(A).

Interested persons may petition FWS to list species under the Act.  *Id*. at §

1533(b)(3)(A).  "To the maximum extent practicable," FWS must, within 90 days

of receiving a petition, determine whether it presents "substantial scientific or

---

[1] Depending on the species involved, "Secretary" in the ESA refers to either the Secretary of the Interior or Commerce. 16 U.S.C. § 1532(15). The grayling falls under the jurisdiction of Interior.  The Secretary has delegated her responsibilities to FWS.

commercial information indicating that the petitioned action may be warranted." *Id*. This is referred to as a "90-day finding." If FWS makes a "positive" 90-day finding, it begins a "review of the status of the species concerned" and must make a second finding (referred to as the "12-month finding") that the petitioned action is: (a) not warranted; (b) is warranted; or (c) is warranted but precluded by higher priority pending proposals, and expeditious progress is being made to list, delist, or reclassify. *Id*. § 1533(b)(3)(B); 50 C.F.R. § 424.14. If the listing of a species is "warranted but precluded," the species is designated a "candidate" for listing, and FWS must annually review the petition until it determines either listing is warranted or not warranted. *Id*. § 1533(b)(3)(C)(i).

If FWS issues a "warranted" 12-month finding, it must promptly publish in the Federal Register "a general notice and the complete text of a proposed regulation to implement" the listing, 16 U.S.C. § 1533(b)(3)(B)(ii), (5)(A)(i), and provide for a public comment period of 60 days. 50 C.F.R. § 424.16(c)(2). FWS must thereafter make a final listing determination within 12 months (*Id*. § 1533(b)(6)(A)), or 18 months if there is "substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination," (*id*. § 1533(b)(6)(B)(i), (iii)). A final listing determination can be either: (1) adoption of the final rule; or (2) withdrawal of the proposed rule because FWS determines that the species is not endangered or threatened (*id*. § 1533(b)(6)(B)(ii)).

3

### III.   FACTUAL BACKGROUND

In 2010, FWS identified the grayling DPS as a "candidate" for ESA

protections, but concluded that other higher priority actions precluded its' listing.

AGPF000003. *See* 75 Fed. Reg. 54708 (Sept. 8, 2010). On August 20, 2014, FWS

issued a new 12-month finding that the petition to list the grayling DPS as

threatened or endangered was not warranted. AGPF000002. FWS based its 2014

determination on several new factual developments since 2010.

First, in 2010, FWS determined that the grayling DPS only included five

native populations. AGPF000006. In 2014, based on new genetic data, FWS

concluded that an additional 15 populations warranted inclusion in the DPS.

AGPF000007.

Second, unlike in 2010 FWS determined in 2014 that historical habitat-

related stressors were no longer a threat. AGPF000038. Eighteen populations are

on Federal land and protected by adequate regulatory mechanisms. *Id.* These

populations appear stable or are increasing in abundance and distribution. *Id.*

Habitat related threats are also being effectively mitigated on private land through

the implementation of a Candidate Conservation Agreement with Assurances

("CCAA"). *Id.* Since implementation, 31 landowners have enrolled 158,000 acres

(approximately 52% of eligible land) in the Big Hole River Valley. AGPF000025.

Almost all (98%) of core grayling habitat in the Big Hole River is now connected. AGPF000019. Riparian restoration efforts in over 110 miles (65%) of riparian habitat have appreciably reduced water temperatures, and streamflow has improved 28%. *Id*. As a result, Arctic grayling are increasing in abundance and distribution on private lands in the Big Hole River. AGPF000038.

Third, by 2014, reduced genetic diversity, low abundance, and stochastic (random) events were no longer threats. Genetic analysis unavailable in 2010 indicates that grayling populations contain high to moderate levels of genetic diversity. *Id.* Further, this data indicate that grayling abundance is higher than previously believed. *Id.* Currently, multiple, resilient populations of both adfluvial and fluvial Arctic grayling occur across a representative portion of the species' historical range. *Id.*

In sum, FWS determined in 2014 that, with sufficient habitat, higher than previously estimated abundances and genetic diversity, as well as stable to increasing population trends, the grayling did not qualify for listing under the ESA. *Id.*

## IV.   STANDARD OF REVIEW

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706(2)(A), provides the waiver of sovereign immunity as well as the scope and standard of

review for this action.  *Bennett v. Spear*, 520 U.S. 154, 173-74 (1997); *San Luis & Delta–Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Although a reviewing court's inquiry in an APA case "must be thorough, the standard of review is highly deferential; the agency's decision is 'entitled to a presumption of regularity,' and [the reviewing court] may not substitute [its] judgment for that of the agency."  *Id.* at 601 (citations omitted).

The court is to be "most deferential" when, like here, "the agency is making predictions, within its area of special expertise, at the frontiers of science." *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (*en banc*) (quotations, citation omitted).  A reviewing court may reverse a decision as arbitrary and capricious under the APA "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id*. at 997 (quotations, citation omitted).

## V.   ARGUMENT
### A. FWS Reasonably Decided Not to List the Grayling DPS.

Here, FWS found that the grayling DPS is neither in danger of extinction nor is likely to become endangered in the foreseeable future. 16 U.S.C. § 1532(6), (20); AGPF000039. In reaching this conclusion, FWS thoroughly and objectively

examined all available scientific and commercial information pertaining to the five statutory listing factors. AGPF000017-39.

Only three of these five factors (*i.e.*, Factors A, D, and E) are at issue in this case. As to factor A, "the present or threatened destruction, modification, or curtailment of [the species] habitat or range," FWS made four principal findings. First, most populations reside in high-quality habitat on Federal land where mechanisms exist to conserve habitat. AGPF000027. Second, the CCAA is eliminating historical threats to habitat in the Big Hole River. *Id*. Third, conservation projects have improved riparian areas, leading to cooler overall water temperatures that are expected to minimize the effects of climate change by blocking solar radiation. *Id*. Fourth, the increase in the number of breeding adults and grayling abundance demonstrate that grayling populations are responding favorably to these habitat changes. AGPF000019.

 For listing factor D, "the inadequacy of existing regulatory mechanisms," FWS determined that, because most grayling populations occur on federal land, they are adequately protected by existing regulatory mechanisms that preclude destruction of those habitats. AGPF000035. FWS also concluded that additional regulatory protections were not required on private land because Federal regulations, such as the Clean Water Act (33 U.S.C. § 1251 *et seq.*), in concert

with other existing conservation efforts, were adequate to sustain and improve habitat for grayling on those lands. *Id.*

For listing factor E, "other natural or manmade factors affecting [grayling's] continued existence," FWS determined that loss of genetic diversity from small population size or from stochastic events were not threats. AGPF000036-37. Updated genetic information indicates that the grayling DPS contains high genetic diversity. AGPF000037. Although loss of genetic diversity can occur in small populations, FWS concluded that there were adequate numbers of breeders to minimize genetic loss. *Id.* FWS estimated the annual population census size, or the population size of reproductively mature individuals, from the calculated effective population size. AGPF000016. As the best available science indicates, populations with a census size numbering similar to those estimated for grayling lose genetic diversity slowly. AGL000098. Thus, even though effective population size is low for some grayling populations, the estimated census numbers indicate that grayling populations will maintain genetic diversity for many years. AGL000098.

The record also supports FWS' conclusion that grayling are not threatened by catastrophic events, because the DPS displays sufficient redundancy and separation to minimize risk. AGPF000037. Moreover, because many of the 20 grayling populations have access to multiple spawning tributaries, adequate redundancy exists in the population to minimize extinction risk. AGPF000037.

8

That means that if one or more populations is lost to stochastic events, or if one or more spawning sites is similarly lost, the grayling population contains adequate diversity to conserve life-history. *Id.*

## B. FWS' 2014 Decision is Appropriately Based on a New Administrative Record.

Before getting to Plaintiffs' particular factual arguments, we must address Plaintiffs' underlying legal premise that FWS "arbitrarily reversed" its 2010 finding. Pls. Mem. at 4, 7, 16, 20, 22, 24. That is incorrect. The 2010 "warranted but precluded" finding was not a final listing decision, and it therefore could not have been "reversed" in 2014. Rather, the 2010 finding is properly viewed as a step in an evolving deliberative process that culminated in FWS' final listing decision in 2014. Indeed, the ESA expressly states that a warranted-but-precluded finding "shall be treated as a petition that is resubmitted to the Secretary." 16 U.S.C. § 1533(b)(3)(C)(i); *see also id.* at § 1533 (b)(6)(A). FWS then has a duty to reconsider the available information anew and "make a finding as to whether the petition" warrants listing. *Id.* § 1533(b)(3)(A).

Even if FWS makes a determination that a petition warrants listing, that is still not a final listing determination. The ESA describes additional steps that FWS must complete before reaching a final listing determination, such as publishing a proposed listing rule and providing for public comment. 16 U.S.C. § 1533(b)(3)(B)(ii), (5)(A)(i). The final listing determination only occurs after FWS

9

has taken the necessary steps in the rulemaking process and takes the form of either (1) adoption of the final rule; or (2) withdrawal of the proposed rule because FWS determines that the species is not endangered or threatened. *Id*. § 1533(b)(6)(B)(ii). For these reasons, Plaintiffs' reliance on *Federal Communications Commission v. Fox Television Stations*, 556 U.S. 502 (2009), is misplaced. Pls. Br. at 20, 24. *Fox Television* applies only when an agency changes its official policy or departs from a final regulation. *See Sierra Club v. Bureau of Land Mgmt*., 786 F.3d 1219, 1226 (9th Cir. 2015). Here, FWS has not reversed a final policy or regulation. Rather, FWS completed the next step in an iterative listing process.

Furthermore, FWS' 2014 determination was not a "reversal" of position because it was based on different information than the 2010 assessment. *See* AGPF000038. In 2014, FWS encountered an entirely changed set of circumstances than it did in 2010. As described above, new genetic information indicated that the DPS included an additional 15 populations, all of which were in high-quality habitat and protected on Federal land, and that genetic diversity was high, decreasing the risk of losing genetic diversity over time. AGPF000038. Moreover, grayling populations were doing well – populations were all either stable or increasing and population abundance was higher than estimated in 2010. *Id*.  FWS may have reached a different determination in 2014 based on these changed facts,

but this cannot be described as a "reversal." Thus, even if *Fox Television* applied here, which it does not, FWS complied with its requirements. FWS forthrightly acknowledged in the 2014 Finding why changed circumstances led to a different conclusion from the one the agency had reached in 2010. AGPF000038. Moreover, FWS articulated a reasoned basis for the 2014 listing determination. To meet the standard articulated by *Fox Television*, an agency need only "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." 556 U.S. at 515 (emphasis in original).

### C. Federal Defendants are Entitled to Judgment on Count I.

Count I challenges FWS' analysis of listing factor D, 16 U.S.C. § 1533(a)(1)(D). Compl. ¶¶ 78-80. FWS rationally explained the basis for its analysis of this factor. Specifically, in 2010, existing regulatory mechanisms were believed to be inadequate because they had failed to halt or reverse reported population declines; whereas, by 2014, updated information revealed that all but one grayling population was either "stable or increasing." AGPF000038. Given the improvement in the grayling's abundance in the four years that followed FWS' 2010 finding, FWS could reasonably conclude in 2014 that existing regulatory mechanisms were adequate to protect the grayling from known threats.

Plaintiffs incorrectly contend that FWS considered voluntary conservation measures as part of its factor D analysis. Pls. Mem. at 8. FWS expressly stated

that its factor D analysis discussed "[o]nly existing ordinances, regulations, and laws, that have a direct connection to a law, are enforceable and permitted." AGPF000032. Indeed, it is apparent from the listing determination that FWS analyzed conservation measures under the CCAA in its factor A analysis (discussed *infra* § E) not its factor D analysis. AGPF000018-27.

Because the record undermines Plaintiffs' claims, the Court should grant summary judgment in favor of Federal Defendants on Count I.

## D.     Federal Defendants are Entitled to Judgment on Count II.

Count II challenges FWS' analysis of listing factor E, 16 U.S.C. 1533(a)(1)(E), specifically alleging that the DPS is threatened  by low population size.  Compl. ¶¶ 81-83; Pls. Mem. at 16-25. Plaintiffs argue that FWS ignored the best available science about grayling abundance and genetic diversity. *Id*. Contrary to Plaintiffs' arguments, FWS properly exercised its scientific expertise in analyzing grayling population trends and rationally explained those conclusions in the 2014 Finding.

### 1.     <u>FWS' Population Findings Were Not Arbitrary</u>

FWS rationally determined that Leary 2014 is the best scientific information available with respect to grayling population trends. *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 602 ("The determination of what constitutes the 'best scientific data available' belongs to the agency's special expertise"). First, Leary

12

provides the most recent population data. *Compare* AGPF002494 (estimating population trends through 2012) *with* AGPF002616 (estimating population trends through 2013). Second, contrary to Plaintiffs' argument, DeHaan, *et al.*, (2014) does not contradict FWS' conclusions, nor does it run counter to Leary (2014). Although DeHaan concluded that the number of breeders in the Big Hole River declined over the course of the study, "the number of offspring produced may not have similarly declined and [] there has been little change in genetic variation." AGPF002511; AGPF002527 *compare* AGPF002615 (showing little genetic variation[2] in the Big Hole population). In analyzing both of these studies together, FWS was well within its area of expertise when assigning greater weight to Leary's data.

FWS also did not ignore Montana Fish, Wildlife, and Parks' ("FWP") monitoring data as Plaintiffs' suggest. Pls. Mem. at 18. Rather, FWS used DeHaan's and Leary's genetic studies and FWP's monitoring data for different and distinct purposes. FWS relied on the FWP electrofishing results to determine the effectiveness of habitat conservation measures (catch per unit effort). AGPF000019. In contrast, genetic sampling is a complementary way to assess abundance and other population level trends. *See* AGPF002492. As the expert

---

[2] Ar stands for "allelic richness," which is a measure of genetic diversity. *See*, AGPF002510.

agency, FWS appropriately relied on genetic sampling as the best science available to estimate population trends.

Even assuming for the sake of argument that FWS should have given more weight to the FWP sampling data, Plaintiffs' characterization of the data as exhibiting a "significant decrease in grayling numbers" is incorrect. Pls. Mem. at 18. Although the total number of grayling captured in the Big Hole decreased from 2012 to 2013, there is no indication that the difference between 156 and 118 is "significant" to the Big Hole population. *Compare* AGPF002870 *with* AGPF002608. Moreover, the explanation that capture rate was lower in 2013 due to "unusually high flows" is supported by the decrease in capture rate for *all* species of fish in the Big Hole River between 2012 and 2013. *Compare* AGPF002870 *with* AGPF002608. Similarly, the decrease in population is not necessarily significant for the Ruby River population. Although the number of captured grayling in the Ruby River was less in 2013 than in 2012, the total distance surveyed also decreased in 2013.  *Compare* AGPF002603 *with* AGPF002864. Taking this difference into account, catch per unit effort changed very little between 2012 (13.33 grayling/mile) and 2013 (12.42 grayling/mile). *Id.*

In sum, Plaintiffs identify no study that FWS failed to address. *See Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1081 (9th Cir. 2006) ("Without any evidence in the record that FWS ignored relevant information, we hold that FWS

satisfied its duty to base its listing determinations on the best available data").

Rather, Plaintiffs dispute the weight accorded by FWS to particular pieces of

evidence. This is not a basis for overturning the agency's well-reasoned decision.

### 2.  __FWS' Analysis of Genetic Diversity Was Reasonable.__

As FWS explained, loss of genetic diversity is not a threat "because there are

adequate numbers of breeders." AGPF000037. Plaintiffs cast this as an analysis of

only "immediate threats;" however they take FWS' analysis out of context. Pls.

Mem. 19. In referring to the immediacy of potential threats, the text is clear that

FWS was explaining only that "loss of genetic diversity due to small effective

population size typically does not drive a population to extinction," rather, "other

processes … have a greater and more immediate impact." AGPF000037. This

explanation did not place a temporal limit on FWS' ultimate conclusion about loss

of genetic diversity. Moreover, contrary to Plaintiffs' claims, the record shows that

FWS considered the long-term likelihood of survival. AGPF002345;

AGSAW000005; AGPF002352 (consideration of population size and probability

of persistence for 10-, 25-, and 50-year time-frames).

Plaintiffs' argument that FWS' conclusions were arbitrary because the

effective populations of the Big Hole and Ruby River are less than 500, Pls. Mem.

at 21,  is undermined by the record.  The 500 standard is "not a threshold trigger"

for predicting extinction risk, but instead a guideline for maintaining genetic

15

diversity. AGSR010786. Instead, "evaluating temporal trends in estimates of [number of breeders] and [effective population size] are often more useful than determining whether a population meets some minimum threshold number." AGPF00251. Thus, FWS reasonably relied on the number of breeders to determine that grayling were not at risk for long-term genetic drift.

### 3.   FWS Rationally Concluded that Stochastic Events Were Not Threats.

Plaintiffs attack FWS' conclusion that grayling were not vulnerable to stochastic events on three grounds: (1) FWS should have explained why the 2010 population viability analysis ("PVA") was no longer relevant (2) FWS' reliance on geographic separation was arbitrary; and (3) FWS' determination that the Ruby River population was viable was irrational. Pls. Mem. 21-25. Plaintiffs' arguments lack factual and legal support.

First, Plaintiffs' argument regarding the PVA is, at bottom, an improper attack on FWS' scientific methodology, which is "owed substantial deference." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004) (citation omitted). Courts may not "impose on the agency [their] own notion of which procedures are best or most likely to further some vague, undefined public good." *Lands Council,* 537 F.3d at 993 (quotation omitted). As the record explains, FWS rationally determined that the PVA was no longer the

"best available science" in 2014 (AGSAW00001-02) because it estimated

extinction risk for only five populations, each of which were assumed to be either

stable or declining and most of which spawned at only one location, making them

more vulnerable to extinction risk. AGPF002950-53. In 2014, these assumptions

were no longer true. Boyd Decl. (ECF 27-1) at 4-7. For example, in 2014 FWS

determined that the DPS consisted of 20 populations, not five. AGPF000016-18.

New evidence also indicated that grayling populations were either stable or

increasing and that grayling were less susceptible to catastrophic events because

they could spawn in multiple locations. AGPF000016-17; AGPF000037. Indeed,

grayling experts recommended that FWS not use a quantitative approach because

of this modeling uncertainty. AGSAW00002.

Second, FWS' analysis of separation in the 2014 Finding is consistent with

its analysis in 2010. In both 2010 and 2014, FWS determined that geographic

separation protected the DPS as a whole from the risk of an environmental

catastrophe. *Compare* AGPF002969 *with* AGPF000037. However, in 2010

individual populations were still at risk from stochastic events because they were

threatened by other factors such as low abundance and lack of redundancy in

spawning sites, AGPF002969, whereas these same factors were no longer threats

to individual populations in 2014. AGPF000037.

17

Similarly, FWS provided a reasoned basis for considering the Ruby River population to be viable in 2014. In 2014, grayling experts concluded that the Ruby River population was viable based on increased numbers of breeding adults, high levels of genetic diversity, and five years of documented natural reproduction supported this conclusion. AGPF000026. Although the Ruby River population exhibits a low number of effective breeders, it contains the second-highest genetic diversity of all DPS populations. AGPF000036. Plaintiffs' argument that the size of the Ruby River population renders its persistence "uncertain" is without merit.[3]

**E.   Federal Defendants are Entitled to Judgment on Count III.**

Count III challenges FWS' analysis of listing factor A, 16 U.S.C. 1533(a)(1)(A).  Compl. ¶¶ 84-86.  Plaintiffs' arguments in support of the claim (Pls. Mem. at 9-16), fail to show that FWS acted unlawfully.

**1.   FWS' Streamflow and Temperatures Analyses Were Rational.**

Plaintiffs' challenge to FWS' factor A analysis is largely an attack on the CCAA's ability to mitigate the threats of low stream flows and high temperatures. Pls. Mem. at 10-13. By focusing only on the CCAA, Plaintiffs' ignore FWS' well-reasoned analysis of factor A for the entire grayling DPS. *See* supra § A.  Indeed, 17 of the 20 populations within the DPS occur in high-elevation habitat with intact

---

[3] FWS also reasonably concluded that there was "no concentration of threats" acting on the Ruby River population and that it did not warrant further analysis under the significant portion of the range ("SPR") policy. AGPF000039.

riparian areas not threatened by increased water temperatures. AGPF000023.

Moreover, FWS' conclusion that the CCAA is effectively mitigating habitat related

threats in the Big Hole Valley was reasonable. *See supra* § A.

Although water temperatures in the Big Hole exceeded 70 degrees during

summer months, FWS explained that the available science indicated that grayling

used tributaries as refuge when water temperatures in the Big Hole were too high.

AGPF000021. Plaintiffs argue that, because this science was available in 2010, it

cannot justify FWS' decision in 2014. Pls. Mem. at 11. Plaintiffs overlook the fact

that, while cooler water was available in some reaches of the Big Hole River in

2010 (AGPF004307), habitat fragmentation kept fish from accessing it.

AGPF002953 (explaining that smaller dams and fish passage barriers block access

to refuge habitat). Habitat fragmentation in the Big Hole was no longer a threat in

2014. AGPF000038; AGPF000021. Thus, FWS' conclusions about thermal refugia

were rational.

Plaintiffs cited case, *Tucson Herpetological Society v. Salazar*, is inapposite.

566 F.3d 870, 879 (9th Cir. 2009). Unlike in *Tucson*, here FWS relied on the cited

studies for exactly what they represent – that thermal refugia exists. AGPF000023.

FWS then used its scientific expertise to interpret data about habitat connectivity,

available cold-water refuge, and population increases collectively to rationally

conclude that warm water was not a threat to the grayling DPS. AGPF000019, AGPF000023.

Similarly, FWS' conclusions about thermal stress in the Madison River and Centennial Valley are reasonable. Mere uncertainty, or the fact that evidence may be "weak," is not fatal to an agency decision. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir. 1992); *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014).

Although the existing data could support a finding that warm water threatens grayling, "[i]t would be equally easy to say it's not [a threat] because cold water refugia exist and will in perpetuity." AGSR000482. Advice in the record counseled FWS to resolve this dispute by "look[ing] at the population for empirical evidence," further noting that because grayling are doing well, it would be difficult to conclude that "warm temperatures in the lake are a threat." *Id.* Indeed, the record supports the conclusion that Centennial grayling are increasing. AGPF000016, AGPF002512. At bottom, Plaintiffs disagree with FWS' interpretation of the evidence; however, the Court cannot remand the 2014 Finding based on a difference of opinion.  *See, e.g., Lands Council*, 537 F. 3d at 988.

## 2.  **FWS Properly Considered the CCAA Under Factor A.**
To the extent that Plaintiffs contend FWS cannot rely on successes that have been documented under the CCAA simply because participation in those

conservation measures is voluntary (Pls. Mem. at 8-9), that argument has no

support in the ESA. The ESA expressly requires FWS to "tak[e] into account those

efforts, if any, being made by any State or foreign nation . . . to protect such

species" before reaching a listing decision.  *Id.* § 1533(b)(1)(A); *accord* 50 C.F.R.

§ 424.11(f).  Nowhere does the ESA preclude consideration of conservation

measures because participation is voluntary.[4]

Numerous courts have rejected arguments that the Services cannot consider

the ameliorative effects of voluntary conservation agreements.  *Colorado River*

*Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 207-08 (D.D.C. 2012); *Defenders*

*of Wildlife v. Babbitt*, 97-cv-2330TW(LSP), 1999 WL 33537981, at *7 (S.D. Cal.

June 14, 1999); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv*., No. 05–

cv–00305–RPM, 2007 WL 716108 at *3 (D. Colo. Mar. 7, 2007).  Plaintiffs cite

several cases where courts have disapproved of reliance on conservation efforts not

---

[4] To that end, over a decade ago, FWS promulgated a formal policy to "establish criteria for determining when [FWS] could deem otherwise incomplete and unproven voluntary conservation efforts sufficiently certain to be implemented and effective to be relied on in evaluating ESA's listing factors." *Defenders of Wildlife v. Jewell*, 815 F.3d 1, 8 (D.C. Cir. 2016) (citing 68 Fed. Reg. 15100, 15113-14 (Mar. 28, 2003)). FWS' interpretation is that disregarding voluntary conservation efforts would be contrary to the ESA and congressional intent. 68 Fed. Reg. at 15,106, 15,113. That interpretation deserves deference. *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984). Because the CCAA has been implemented and proven effective, FWS did not need to employ the policy for evaluation of conservation efforts in this case.

fully implemented (Pls. Mem. at 10); however, that is plainly not the situation here, given the CCAA's proven record.

Moreover, the CCAA is not "speculative," as Plaintiffs suggest. Pls. Mem. at 8. The CCAA has been in place for nearly a decade and has a proven record of success in ameliorating the present or threatened destruction, modification, or curtailment of the grayling's habitat or range. 16 U.S.C. § 1533(a)(1)(A).  Indeed, in the finding, FWS focused on the effects of the many conservation and restoration projects that already have been completed under the direction of the CCAA on the potential stressors analyzed under factor A for the Big Hole River population. AGPF000018-26. Moreover, FWS expressly noted that it had "not considered future anticipated conservation actions outlined in unsigned site plans as part of this status review or our listing determination for this DPS." AGPF000025.

Finally, Plaintiffs' speculation that landowners may abandon their voluntary conservation commitments because the grayling DPS was not listed is groundless. Even if avoiding the "threat of ESA listing" was a landowner's only incentive for participating in voluntary conservation measures, that incentive can never be "gone" because the species can always be listed in the future if circumstances change. *Defenders*, 815 F.3d at 8; 16 U.S.C. § 1533(b)(3)(A), (7); AGPF000040. Moreover, prohibiting FWS from considering the positive effects of voluntary

conservation measures would eliminate landowners' incentive to enter into voluntary conservation commitments in the first instance and would diminish the use of an important conservation tool.

### 3.   FWS Rationally Evaluated the Threat of Climate Change.

Plaintiffs argue that FWS employed "guesswork" and arbitrarily evaluated the potential effects of climate change on the grayling DPS.  Pls. Mem. at 13-16. Contrary to Plaintiffs' claims, FWS' analysis of both the current and future effects of climate change was rational.

In analyzing the current effects of climate change, FWS concluded that there was "no information to conclude that increasing air temperatures have had a significant effect on [the] number of breeding Arctic grayling in these systems in recent years."[5] AGPF000024. This is well-supported by the record. AGPF02516-17 (although mean air temperature increased across multiple drainages, grayling response was not consistent); AGPF002512, AGPF002616.

FWS also analyzed the future effects of climate change. AGPF000024-25. The best available science indicates that solar radiation, not ambient air temperature, is the driving force behind climate related stream temperature

---

[5] Plaintiffs' assertions that increases in grayling abundance are attributable to FWP stocking efforts has no merit. Pls. Mem. at 14.  Genetic sampling of grayling indicated a low-level of relatedness, meaning the FWP stocking efforts contributed very little to the increase in breeding adults. AGPF000027, AGPF002618.

increases. *Id.*; ALG000103. FWS found that climate change is not a significant future threat to grayling because "riparian restoration activities have appreciably reduced water temperatures" by blocking solar radiation and reducing the amount of surface area with which solar radiation can interact. *See* AGPF000038.

Plaintiffs challenge this conclusion, arguing that stream temperatures are already "above habitat suitability thresholds." Pls. Mem. at 15. However, this argument ignores the dramatic decrease in the number of days and hours per day that the Big Hole River and tributaries no longer exceed lethal conditions for grayling. AGPF000019; AGSR000188. In 2010, FWS found that "water temperatures that are high enough to cause [grayling] mortality," that is, water temperatures exceeding 77 degrees, "represent a clear threat to Arctic grayling." AGPF002956. By contrast, since implementation of the CCAA, water temperatures no longer exceed lethal conditions for grayling. AGPF000019.

Similarly, Plaintiffs' challenge to FWS' analysis of the cumulative effects of climate change fails. Nor is Plaintiffs' reliance on *Greater Yellowstone Coalition v. Servheen* (Pls. Mem. at 15) persuasive. 665 F.3d 1015 (9th Cir. 2011). There, not only did FWS rely on scientific uncertainty as the basis of its decision to delist the grizzly bear, but it also failed to articulate a rational basis for concluding that delisting was warranted. *Id.* at 1024-28. Here, FWS did not rely on scientific uncertainty as the basis for its "not warranted" finding. AGPF000037. Instead,

FWS concluded, and the record supports, that, although synergistic effects between climate change and dewatering are possible, the best science available does not allow FWS to reliably predict what those effects might be. *Id.*; AGL003820; AGL0003794; ALG000036; AGL000113; AGL000115.

The fact that FWS did not make any predictions about the synergistic effects of climate change and dewatering is consistent with its analysis of the cumulative effects of climate change from 2010. *Compare* AGPF002968 *with* AGPF000037. In fact, in 2010 FWS did not consider "climate change in and of itself to be a significant factor in [its] determination," only that "climate change will potentially intensify some of the significant current threats to populations." AGPF002968.  In 2014, stream dewatering and increased water temperatures were no longer threats, and as such FWS rationally concluded that climate change was also not, in and of itself, a threat.

### F.  Federal Defendants are Entitled to Judgment on Count IV.

Count IV challenges the fact that FWS' SPR Policy, 79 Fed. Reg. 37578 (July 1, 2014), does not interpret "significant portion of its range" as applying to lost historical range.  Compl. ¶¶ 88-89; Pls. Mem. at 25-29.  Count IV provides no legal basis for overturning FWS' finding.  Indeed, district courts in the Ninth Circuit have rejected the very argument that Plaintiffs offer here.  *WildEarth Guardians v. Jewell*, No. 2:14–cv–00833 JWS, 2015 WL 5770537 (D. Ariz. Sept.

25

8, 2015); *Defenders of Wildlife v. Jewell, et al.*, CV-14-246-M-DLC, ECF No. 108 at 74 (D. Mont.) (Apr. 4, 2016).

Like Plaintiffs in this case, the plaintiff in *WildEarth Guardians* argued that FWS' decision not to list the Gunnison's prairie dog failed to "consider the species' lost historic occupied areas as potentially significant portions of the [species'] range as required by *Defenders of Wildlife v. Norton* [258 F.3d 1136 (9th Cir. 2001)]" 2015 WL 5770537 at *4. *Compare* Pls. Mem. at 26 *with* 2015 WL 5770537 at *4. As the *WildEarth Guardians* court explained, controlling Supreme Court precedent dictates that the SPR Policy supersedes the interpretation of "significant portion of its range" offered by the Ninth Circuit in *Norton* and *Tucson Herpetological Society*, 566 F.3d at 877. 2015 WL 5770537 at *7 (citing *Nat'l Cable & Telecomm'n Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) (a court's prior judicial construction of an ambiguous statutory term is trumped by an agency's subsequent interpretation of that term, provided that the agency's interpretation is entitled to deference under *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), and reasonable).

The SPR Policy, "which was subject to notice and comment and officially sets forth the [FWS'] interpretation of what it means for a species to be in danger of extinction 'throughout all or a significant portion of its range,' is entitled to *Chevron* deference." *WildEarth Guardians,* 2015 WL 5770537 at *6.  The phrase

"significant portion of its range" is ambiguous, and "it is clear that [FWS] is the 'agency responsible for the protection and recovery of endangered [ ] species,'[] and therefore, 'has the authority to interpret the ESA' through rules that carry the force of law.'"  *Id*. (citation omitted).

In addition, FWS' interpretation of the term "range" in the SPR Policy is patently reasonable.  The Policy explains that "range" must mean "current range" at the time of the listing decision and not "historical range," because the ESA defines a species as endangered if it "is in danger of extinction."  79 Fed. Reg. at 37583.  Common understanding of the phrase "is in danger" is a present-tense condition of being at risk.  *Id*.  A species cannot "be in danger" in an area where it does not exist (*i.e.*, lost historical range).  Thus, the SPR Policy reasonably interprets the text of the ESA as not requiring the Services to determine whether lost historical habitat is a "significant portion of [the] range."  *Id*.[6]

---

[6] Plaintiffs' contention (Pls. Mem. at 28) that Section 4(c)(1) of the Act, 16 U.S.C. § 1533(c)(1), requires the Services to determine whether lost historical habitat is a "significant portion of [the] range" has no merit.  As a court in this District has held, Section 4(c)(1) is merely a "publishing requirement," and "[i]t makes no sense to read" Section 4(c)(1) as "altering the substantive determination of when a species is endangered, or what protections the species must be given."  *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1220 (D. Mont. 2010).  Indeed, the Services considered Section 4(c)(1) at length in their proposed and final SPR Policy, and reasonably explained that the interpretation that "best harmonizes the various parts of the Act and relevant case law is to treat section 4(c)(1) as an informational rather than a substantive provision."  79 Fed. Reg. at 37583.

The SPR Policy does not, as Plaintiffs assert (Pls. Mem. at 27), allow FWS to categorically disregard historical range.  Rather, FWS merely "consider[s] lost range in a different manner than contemplated by the Ninth Circuit in *Defenders*." *WildEarth Guardians*, 2015 WL 5770537, at *11 n.61.  Specifically, FWS "considers the effects of loss of historical range on the current status of the species, rather than explicitly considering whether lost historical range is itself a significant portion of a species' range." *Id*. (citing 79 Fed. Reg. at 37584).  Accounting for lost historical range as part of the species' status is consistent with the text of the Act and, as a practical matter, likely to lead to the same listing decision as considering lost historical habitat as part of the "significant portion of its range" analysis.  79 Fed. Reg. at 37584.  Specifically, if a species' status renders it endangered or threatened because of lost habitat, that lost habitat likely would be a "significant portion of its range." *Id*.

Plaintiffs' further argument that considering whether a species' lost historical range renders it endangered or threatened within its current range "impermissibly equates imperilment throughout the species' range with imperilment in any portion" (Pls. Mem. at 27-28), is incorrect.  As noted above, a species cannot "be in danger" in an area where it does not exist.  Furthermore, the SPR Policy does not preclude listing a species if it is threatened or endangered in any significant portion of its current range.  79 Fed. Reg. at 37585.  Lastly,

Plaintiffs' contention that the SPR Policy is contrary to the ESA's goal of ecosystem conservation (Pls. Mem. at 28) lacks support in the statute.  As the SPR Policy explains, the term "range" is used in the Act in reference to whether a species warrants listing, but has no bearing on how that species or its habitat are protected after it is listed.  79 Fed. Reg. at 37583.

## VI.   CONCLUSION

For all of the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment and grant Federal Defendants' cross-motion for summary judgment.


Dated: April 15, 2016

                              Respectfully submitted,

                              JOHN C. CRUDEN
                              Assistant Attorney General
                              United States Department of Justice
                              Environment & Natural Resources Division

                              SETH M. BARSKY, Chief
                              MEREDITH L. FLAX, Assistant Chief
                              Wildlife & Marine Resources Section

                              /s/  Nicole M. Smith
                              NICOLE M. SMITH, Trial Attorney
                              Ben Franklin Station, P.O. Box 7611
                              Washington, D.C. 20044-7611
                              Telephone: (202) 305-0368
                              Fax: (202) 305-0275
                              nicole.m.smith@usdoj.gov

*Attorneys for Federal Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, this 15th day of April, 2016, I electronically filed the foregoing documents with the Clerk of the Court via CM/ECF system, which will send notification of such to the attorneys of record.

/s/ *Nicole M. Smith*

NICOLE M. SMITH

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief is 6,498 words, in accordance with Local Rule 7.1(d), excluding the caption, table of authorities, table of contents, exhibit list, table of acronyms, signature blocks, and certificates of compliance and service. Pursuant to Local Rule 7.1(d), a table of contents, table of authorities, and index of exhibits is provided for this brief.

/s/ *Nicole M. Smith*

NICOLE M. SMITH