# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

### BUTTE DIVISION

**FILED**

SEP 0 2 2016

Clerk, U.S. District Court
District Of Montana
Helena

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; WESTERN WATERSHEDS PROJECT; GEORGE WUERTHNER; PAT MUNDAY,<br><br>             Plaintiffs,<br><br>vs.<br><br>SALLY JEWELL, Secretary, U.S. Department of the Interior, in her official capacity; DAN ASHE, Director, U.S. Fish and Wildlife Service, in his official capacity; and UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>             Defendants. | No. CV 15-4-BU-SEH<br><br>**MEMORANDUM OPINION AND ORDER** |

## INTRODUCTION

On August 20, 2014, the United States Fish and Wildlife Service

("Service") issued its Revised 12-Month Finding on a Petition to List the Upper

Missouri River Distinct Population Segment of Arctic Grayling as an Endangered

or Threatened Species; Proposed Rule ("2014 Finding").[1] The decision stated, "After review of the best available scientific and commercial information, we find that listing the Upper Missouri River DPS of Arctic grayling is not warranted at this time."[2]

On February 5, 2015, Plaintiffs commenced this action challenging the Service's 2014 Finding as a violation of the Endangered Species Act ("ESA") and the Administrative Procedures Act ("APA").[3] On June 8, 2015, the Court granted the State of Montana and Montana Department of Fish, Wildlife, and Parks' ("MFWP") unopposed motion to intervene.[4] All parties submitted cross-motions for summary judgment.[5] A hearing and argument on the motions were held. For the reasons set forth below, the Court grants the Service and MFWP's motions for summary judgment, and upholds the Service's 2014 Finding that listing of the Upper Missouri River Distinct Population Segment ("DPS") of Arctic grayling is not warranted at this time.

---

[1] AGPF000001 (A full copy of the Administrative Record is on file and lodged with the Clerk of Court in the United States District Court for the District of Montana, Butte Division. *See* Doc. 16.).

[2] AGPF000002.

[3] *See* Doc. 1.

[4] *See* Doc. 11.

[5] *See* Docs. 38, 41 and 45.

## I.  The Arctic Grayling (*Thymallus Arcticus*)

Arctic grayling is a freshwater fish that shares the taxonomic family Salmonidae with species such as salmon and trout.[6] Native to the Arctic Ocean drainages of Alaska and northwestern Canada, its global distribution today extends east to Hudson Bay, and west across Northern Eurasia to the Ural Mountains.[7] Within the conterminous United States, it is only found in the upper Missouri River system above the Great Falls in Montana and in northwest Wyoming within Yellowstone National Park.[8]

The Arctic grayling's trout-like body is long and laterally compressed with a deeply forked tail.[9] Its most distinguishing feature is a large, brightly colored, sail-like dorsal fin typically marked with rows of orange or bright green spots. Adults average between 12 and 15 inches in length and can vary in color from silver to dark blue.[10] The species is found in both rivers and lakes.[11] Populations

---

[6] *See* AGPF00003.

[7] *Id.*

[8] *See* AGPF000004.

[9] *See* AGPF000003.

[10] *Id.*

[11] *See* AGPF000005-6.

that reside in river habitats are referred to as "fluvial," while those residing in lake habitats are referred to as "adfluvial."[12]

## II. Upper Missouri River Distinct Population Segment

The Lewis and Clark Expedition marked the first documented Euro-American encounter with the Arctic grayling in August of 1805.[13] At its peak in the early 20th century, the species is estimated to have inhabited up to 1,250 miles of streams in the upper Missouri River basin.[14]

Native fluvial populations once inhabited the Smith, Sun, Jefferson, Madison, Gallatin, Big Hole, Beaverhead, and Red Rock Rivers in Montana and the mainstem of the Missouri River.[15] Today, it occupies only 10 percent of its historical range and is found in Montana only in the Big Hole River, a few of its tributaries, the upper Ruby River, and a portion of the Madison River.[16]

Native adfluvial populations are thought to have inhabited the Red Rock Lakes, Elk Lake in the Centennial Valley in southwestern Montana, and a few

---

[12] *Id.*

[13] *See* AGPF000004.

[14] *Id.*

[15] *Id.*

[16] *See* AGPF000006.

small lakes in the upper Big Hole River drainage.[17] Adfluvial populations now occupy numerous lakes throughout the DPS as a result of decades of stocking efforts.[18]

It is estimated that between 1898 to 1960, 100 million Arctic grayling were stocked across Montana and in other western states.[19] Data suggests that the primary source of all the hatcheries in Montana was stock from Montana's Centennial Valley and Madison River populations.[20]

The Service has concluded, based on the most recent data, that the upper Missouri River basin DPS encompassed a total of 26 known Arctic grayling populations which comprised the "listable entity" under the ESA.[21] Six of the introduced populations, however, "[were] considered to have low conservation value because they occupy unnatural habitat, are not self-sustaining, or are used as captive brood reserves."[22]

Of the 20 remaining populations with "conservation value," 6 occupy native

---

[17] *Id.*

[18] *See* AGPF000005-6.

[19] *See* AGPF000006.

[20] *Id.*

[21] *Id.*

[22] *Id.*

habitat and 14 were reintroduced through stocking efforts.[23] The 14 introduced populations have moderate to high levels of genetic diversity.[24] Recent genetic data supports that these populations were derived from native sources within the upper Missouri River basin.[25] It was these 26 populations that comprised the basis for the Service's 2014 Finding not to list the Arctic grayling.[26]

### III. Listing History and Previous Federal Actions

The Service has a long and complex history of involvement with upper Missouri River Arctic grayling that spans more than three decades. In December, 1982, it published its first status review finding that listing under the ESA was "possibly appropriate, but [the Service] did not have sufficient data to support a proposed rule to list the species."[27] The first petition to list the fluvial populations of Arctic grayling in the upper Missouri River basin was received by the service in 1991. Three years later, in response, the Service published a notice of a 90-day finding that listing "may be warranted."[28] In July 1994, the Service published a

---

[23] *Id.*

[24] *See* AGPF000007.

[25] *Id.*

[26] *Id.*

[27] AGPF000002 (*See* 47 Fed. Reg. 58,454 (Dec. 30, 1982)).

[28] *Id.* (*See* 58 Fed. Reg. 4,975 (Jan. 19, 1993)).

12-month notification that listing was "warranted but precluded by other higher priority listing actions."[29] Litigation ensued over the 1994 Finding.[30] A settlement was reached in 2005.[31]

On April 24, 2007, the Service published a revised 12-month finding determining "that fluvial Arctic grayling of the upper Missouri River did not constitute a species, subspecies, or DPS under the Act" and was therefore "not a listable entity" under the ESA.[32] Again, litigation ensued.

As a condition of settlement of the litigation over the 2007 Finding, the Service published a revised 12-month finding in 2010 in which it concluded that listing of the species was "warranted but precluded by other higher priority species."[33] The Service also found at that time "that fluvial and adfluvial Arctic grayling of the upper Missouri River did constitute a DPS," and that the "DPS configuration including both adfluvial and fluvial life histories was the most appropriate . . . because genetic evidence indicated that fluvial and adfluvial life-

---

[29] *Id.* (*See* 59 Fed. Reg. 37,738 (July 25, 1994)).

[30] *Id.*

[31] *Id.*

[32] AGPF000002-3 (*See* 72 Fed. Reg. 20,305 (April 24, 2007)).

[33] AGPF000003 (*See* 75 Fed Reg. 54,708 (Sept. 8, 2010)).

history forms did not represent distinct evolutionary lineages."[34] The Service

concluded that fluvial and adfluvial Arctic grayling populations in the upper

Missouri River basin were genetically closely related and provided a basis to

include both in the same DPS for purposes of making a listing decision under the

ESA.

An agreement in separate, but related, litigation was reached in 2011 in

which the Service agreed to publish "either a proposed listing rule for the Upper

Missouri River DPS of Arctic grayling, or a not-warranted finding, no later than

the end of Fiscal Year 2014."[35] The 2014 Finding was published on August 20,

2014, in accordance with the agreement.[36] The finding concluded that listing of

the species was "not warranted at this time."[37] This "not warranted" finding is the

subject of the present litigation.

## IV. Plaintiffs' Motion for Summary Judgment

Plaintiffs challenge the 2014 Finding on multiple grounds: (1) FWS's 2014

population findings were arbitrary; (2) FWS irrationally concluded that low

---

[34] *Id.*

[35] AGPF000003 (*See* Endangered Species Act Section 4 Deadline Litig., Misc. Action No. 10-377 (EGS), MDL Docket No. 2165 (D. D.C) (known as the "MDL case")).

[36] *See* AGPF000001 (*See also* 79 Fed. Reg.79,383 (Aug. 20, 2014)).

[37] AGPF000002.

population numbers were not a threat while failing to consider impacts on long-term genetic viability, potential affects of environmental disturbances, and by irrationally reversing its 2010 Population Viability Analysis ("PVA"); (3) FWS's conclusion that there was no risk from low stream flows and high stream temperatures was grounded in an irrational reliance on an existing voluntary conservation agreement and an arbitrary explanation of climate change impacts; (4) FWS arbitrarily dismissed the inadequacy of regulatory mechanisms; and (5) FWS's analysis of whether the Arctic grayling is imperilled throughout a significant portion of its range was based on its 2014 "SPR Policy" which was an impermissible interpretation of the ESA.

## ISSUE

The issue before the Court is whether the Service's 2014 Finding not to list the upper Missouri River DPS of Arctic grayling as threatened or endangered, complied with the requirements of the Endangered Species Act, 16 U.S.C. § 1540(g), and the Administrative Procedures Act, 5 U.S.C. § 706. The answer is "yes."

## STANDARD OF REVIEW

### I.    Summary Judgment

A party is entitled to summary judgment if it "shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."[38]  In reviewing agency decisions, "'[t]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"[39]

## II.   Administrative Procedure Act

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706(2)(A), provides the scope and standard of review in the event of a challenge to an administrative agency action.[40]

Under the APA,

> The reviewing court shall –
>
> .   .   .
>
> > (2) hold unlawful and set aside agency action, findings and conclusions found to be–
> >
> > > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

---

[38] Fed. R. Civ. P. 56(a).

[39]  *City & Cty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)).

[40] *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir 2014); *Bennett v. Spear*, 520 U.S. 154, 174 (1997).

with law.[41]

A decision is arbitrary and capricious:

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[42]

"'Review under the arbitrary and capricious standard is narrow, and [a court does] not substitute [its] judgment for that of the agency.'"[43] An agency's action is valid if it "'considered the relevant factors and articulated a rational connection between the facts found and the choices made.'"[44]

Determination of whether an agency "action 'was arbitrary or capricious is highly deferential, presuming the agency action to be valid.'"[45] Judicial review

---

[41] 5 U.S.C. § 706(2)(A).

[42] *Gardner v. U.S. Bureau of Land Management*, 638 F.3d 1217, 1224 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*) (overruled on other grounds by *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008))).

[43] *Gardner*, 638 F.3d at 1224 (quoting *Lands Council*, 537 F.3d at 987).

[44] *Gardner*, 638 F.3d at 1224 (quoting *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008).

[45] *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010) (quoting *Irvine Med. Ctr. v. Thompson*, 275 F.3d 823, 830-31 (9th Cir. 2002)).

under the APA "is 'narrow' but 'searching and careful.'"[46] Courts need not uphold agency actions if "there has been a clear error of judgment."[47]

## III. The ESA

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . . ."[48] Congress further declared "that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the Act]."[49] Species are entitled to receive the full protection of the ESA only if they are listed by the Service as "endangered" or "threatened."[50]

An "endangered" species is one that "is in danger of extinction throughout all or a significant portion of its range."[51] The Act directs the following factors be

---

[46] *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).

[47] *Gifford Pinchot*, 378 F.3d at 1065 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 42-43 (1983)).

[48] 16 U.S.C. § 1531(b).

[49] 16 U.S.C. § 1531(c)(1).

[50] 16 U.S.C. § 1533(a)(1).

[51] 16 U.S.C. § 1532(6).

considered in determining whether to list a species as endangered or threatened:

> (A) the present or threatened destruction, modification, or curtailment of its habitat range;
>
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
>
> (C) disease or predation;
>
> (D) the inadequacy of existing regulatory mechanisms; or
>
> (E) other natural or manmade factors affecting its continued existence.[52]

Listing determinations must be made "solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation . . . to protect such species . . . ."[53] "The best available data requirement . . . 'prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on.'"[54]

Finally, under the ESA, "species" that are eligible for protection "include[] any subspecies of fish or wildlife or plants, and any distinct population segment of

---

[52] 16 U.S.C. § 1533(a)(1)(A)-(E).

[53] 16 U.S.C. § 1533(b)(1)(A).

[54] *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006) (quoting *Southwest Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000)).

any species of vertebrate fish or wildlife which interbreeds when mature,"[55] and that is endangered or threatened "throughout all or a significant portion of its range."[56] The ESA and its implementing regulations do not define the phrase "significant portion of its range" ("SPR").[57] However, in 2014, the Service published a statement of policy interpreting the phrase "significant portion of its range" ("SPR Policy).[58] This SPR Policy is directly at issue in this case and will be discussed in detail.

## DISCUSSION

### I.    Best Scientific Data Available

Foundational to Plaintiffs' assertions is the argument that the Service based its 2014 Finding on "incomplete and nonrepresentative data" and that it "arbitrarily ignored the best available science."[59] The Court disagrees. It finds no evidence in the record that the Service ignored the best available science in

---

[55] 16 U.S.C. § 1532(16).

[56] 16 U.S.C. § 1532(6), (20).

[57] *See National Ass'n of Home Builders v. Norton*, 340 F.3d 835, 848 (9th Cir. 2003); 16 U.S.C. § 1532(6), (20).

[58] *See* 79 Fed. Reg. 37,578 (July 1, 2014) (Codified at 50 C.F.R. Ch. I) (Final Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species"' Final Rule).

[59] Doc. 39 at 24.

making its 2014 Finding.

The ESA states in pertinent part:

> The Secretary shall make determinations required by subsection (a)(1) of this section solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species . . . .[60]

"The determination of what constitutes the 'best scientific data available' belongs to the agency's 'special expertise . . . .'"[61] "The best available data requirement 'merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on.'"[62]

Courts have held that "deference to agency determinations is at its greatest when that agency is choosing between various scientific models . . . ."[63] Determining what constitutes the "best available" data "is itself a scientific

---

[60] 16 U.S.C. § 1533(b)(1)(A).

[61] San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 602 (9th Cir. 2014).

[62] Kern Cty. Farm Bureau v. Allen, 450 F.3d 1072, 1080 (9th Cir. 2006) (citing Southwest Ctr. for Biological Diversity v. Babbitt, 215 F.3d 58, 60 (D.C. Cir. 2000)).

[63] San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d at 610 (citing Nw. Coal. for Alts. to Pesticides v. EPA, 544 F.3d 1043, 1050 (9th Cir. 2008)).

determination deserving deference."[64] "For that reason '[a] court should be especially wary of overturning such a determination on review.'"[65]

Plaintiffs claim the Service ignored data showing the Ruby River and Big Hole Arctic grayling populations were decreasing,[66] and instead used an alternative study to conclude the populations were increasing.[67] It also asserts the Service ignored contrary MFWP population data,[68] ignored its own 2010 PVA,[69] and improperly evaluated the long-term genetic viability of the species.

The 2014 Finding discusses at length new genetic data that rendered the 2010 PVA and the 2010 Finding incorrect. Each of its conclusions from the 2010 Finding were listed. Updated assessments and conclusions were provided in the 2014 Finding. Specifically, the Service found, based on the most recent genetic data, that populations within the DPS, that in 2010 had not been considered to

---

[64] *Miccosukee Tribe of Indians of Fla. v. United States,* 566 F.3d 1257, 1265 (11th Cir. 2009) (citing *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 377–78 (1989)).

[65] *San Luis & Delta-Mendota Water Auth. v. Locke,* 776 F.3d 971, 995 (9th Cir. 2014) (citing *In re Consolidated Salmonid Cases,* 791 F. Supp. 2d 802, 821 (E.D. Cal. 2011)).

[66] *See* AGPF002489 (DeHann, Patrick, et al, *Genetic Monitoring of Arctic Grayling in the Big Hole River and Red Rock Creek and Association with Recent Climate Trends,* U.S. Fish and Wildlife Service Abernathy Fish Technology Center, January 22, 2014).

[67] *See* AGPF002610.

[68] *See* AGSAW000179; AGPF002877.

[69] *See* Doc. 35-1, SUPP-000001.

have conservation value, were now in 2014, recognized to have significant conservation value. This finding altered the population profile and reasonably led to a different listing conclusion in 2014. The 2010 PVA was not arbitrarily reversed or ignored. Instead, it concluded that the PVA was no longer the appropriate data to use, because the assumptions upon which it was based (primarily the number of populations within the DPS considered to have conservation value) were no longer accurate.

Further, there is no evidence in the record that the Service ignored data. The 2014 Finding includes numerous citations to the scientific studies discussed by the Plaintiff.[70] These references indicate to the Court that the Service considered each study, weighed the data based on its expertise, and incorporated it appropriately into its final decision. It is not the job of the Court to decide which scientific data is best, or whether the Service properly interpreted the science. In the absence of evidence that the agency ignored the best available scientific data, the Court must defer to the Service's special expertise.

---

[70] *See, e.g.*, AGPF000001; AGPF002610; AGPF002489 (DeHann, et al); AGPF002579 (MFWP Arctic Grayling Monitoring Report); AGSAW000179 (MFWP Ruby River Data); AGPF002877 (MFWP Big Hole River Data).

## II.     The present or threatened destruction, modification, or curtailment of the species habitat or range

Plaintiffs argue that the Service arbitrarily and capriciously dismissed significant threats to habitat and impermissibly relied on voluntary conservation efforts to justify its 2014 Finding. They specifically argue, *inter alia*, that the Service's reliance on the Candidate Conservation Agreement with Assurances for Fluvial Arctic Grayling in the Upper Big Hole River ("Big Hole CCAA")[71] was inappropriate, and that the Service's climate change analysis was inadequate. The Court disagrees. The Service appropriately and adequately analyzed threats to the Arctic grayling populations at issue.

The 2014 Finding is underpinned by the conclusion, based on scientific data, that the majority of Arctic grayling populations within the DPS are stable or increasing. It stated, "despite fragmentation, sufficient habitat remains intact and is currently supporting multiple, viable, fluvial and adfluvial Arctic grayling populations."[72]

The 2014 Finding further "conclude[d] climate change is not a future threat to the Upper Missouri River DPS of Arctic grayling."[73] This conclusion was

---

[71] *See* AGPF004615.

[72] AGPF000027.

[73] AGPF000025.

based on evidence of reduced water temperatures in streams within the DPS, despite a trend of warming air temperatures. These water temperature decreases were attributed to riparian area restoration efforts, which reduced solar radiation (energy radiated from the sun) on surface waters and subsequently reduced overall stream temperatures. It found evidence that the Arctic grayling has an inherent ability to adjust spawning time with changing water temperatures, which makes it particularly adaptable to warming climate conditions.[74] The Service reasonably concluded that the species will continue to survive and likely adapt to a warming climate.

The Big Hole CCAA[75] was cited as an additional reason why habitat destruction and curtailment was not of significant concern for the Arctic grayling. CCAAs are voluntary conservation agreements between the Service and private or public parties. Each is designed to encourage implementation of conservation measures for species that are candidates for listing under the ESA. In exchange, the CCAA provides assurances to participants that no additional conservation measures will be required if the species is listed in the future.

FWS developed the Big Hole CCAA to enhance conservation of the Arctic

---

[74] *See* AGPF000025.

[75] *See* AGPF004615.

grayling. Its goals include:

> (1) remove barriers to migration;
>
> (2) improve streamflows;
>
> (3) reduce or eliminate entrainment threats; and
>
> (4) improve and protect the function of riparian habitats.[76]

Currently, there are 31 participating landowners and over 158,000 acres within the Big Hole CCAA's "management area."[77]

Although the Big Hole CCAA has not fixed every challenge facing the Arctic grayling on the Big Hole, the positive impacts of the agreement and its programs are not in dispute. For example, pre-Big Hole CCAA data from 2007 shows there were 36 days where maximum stream temperatures exceeded 70 degrees, and 16 days where maximum stream temperatures exceeded 77 degrees (considered lethal temperatures for Arctic grayling). In contrast, post-Big Hole CCAA restoration data from 2013 shows no recorded days with maximum temperatures reaching greater than 70 degrees.[78]

---

[76] AGPF004617, AGPF000025.

[77] AGPF000025.

[78] *See* AGPF000019 (Table 4–Conservation Projects and Results, and Arctic Grayling Response in the Big Hole River Since Implementation of the Big Hole CCAA in 2006).

Plaintiffs also contend the Service's reliance on the Big Hole CCAA is misplaced because participation is voluntary and the incentive to participate disappears when the species is no longer a candidate for listing. The Court finds this argument unpersuasive. The fact that participation in the agreement is voluntary does not negate the positive impacts the CCAA has had on Arctic grayling habitat in the Big Hole. There is no suggestion or proof in the record that at some unspecified point in the future the agreement itself or its participants will disappear.

The Service evaluated the past and current state of habitat throughout the DPS, including along the Big Hole. It reasonably concluded that the DPS, as a whole, was not in danger of habitat destruction or curtailment. Reliance on the Big Hole CCAA, as a component of the analysis, was not improper.

## III. The Adequacy of Existing Regulatory Mechanisms

Plaintiffs challenge the conclusion that adequate regulatory mechanisms exist to preserve the Arctic grayling. Plaintiffs note that the Service concluded in 2010 there were inadequate regulatory mechanisms to ensure protection of the species, but that it arbitrarily reversed its position in 2014 without identifying any new regulatory mechanisms. Plaintiffs further allege that the existing regulatory mechanisms are inadequate, particularly for the core fluvial population found in

the Big Hole, since it is primarily surrounded by private lands on which federal land regulations have little to no effect.

In the 2014 Finding, the Service concluded "the majority of [Arctic grayling] populations [within the DPS] are on Federal land where regulatory mechanisms are in place to preserve intact habitats and are expected to remain in place."[79] The 2014 Finding included an exhaustive list of each state and federal regulatory mechanism, and how it protects the Arctic grayling. It recognized that although the Big Hole population is surrounded primarily by private land, some federal regulations continue to reach the Big Hole (i.e. the Clean Water Act). The species was found to be responding positively to the existing conditions in conjunction with voluntary conservation efforts (i.e. the Big Hole CCAA).

The Service reasonably concluded that adequate federal and state regulatory mechanisms are in place to protect the majority of the Arctic grayling populations within the DPS. Although the 2014 Finding recognized a potential lack of federal and state regulatory mechanisms for the Big Hole population, its analysis was DPS-wide. The Service's conclusion, based as it was on the population data and regulatory mechanisms in place and which cover the majority of the Upper Missouri River Arctic grayling DPS, was reasonable.

---

[79] AGPF000035.

## IV.    Significant portion of its range

Plaintiffs also challenge the Service's interpretation of the statutory phrase "significant portion of its range."  Specifically, Plaintiffs argue that in making a determination of whether a species is threatened or endangered in a "significant portion of its range" it must also consider the species' "historical range," meaning habitat that the species no longer occupies.

Under the ESA, a species may warrant listing if it is endangered or threatened "throughout all or a significant portion of its range."[80]  On July 1, 2014, the Service published its final policy interpreting the phrase "significant portion of its range."  The final policy states in pertinent part:

> Range: The range of a species is considered to be the general geographical area within which that species can be found at the time [the Service] makes any particular status determination.  This range includes those areas used throughout all or part of the species' life cycle, even if they are not used regularly (e.g., seasonal habitats). Lost historical range is relevant to the analysis of the status of the species, but it cannot constitute a significant portion of a species' range.[81]

Plaintiffs cite two Ninth Circuit cases, *Defenders of Wildlife v. Norton*[82] and

---

[80] 16 U.S.C § 1532(6), (20).

[81] 79 Fed. Reg. 37,578, 37,609 (July 1, 2014) (Codified at 50 C.F.R. Ch. I).

[82] *Defenders of Wildlife v. Norton*,  258 F.3d 1136, 1145 (9th Cir. 2001).

*Tuscon Herpetological Soc. v. Salazar,*[83] for the general proposition that, at a

minimum, an agency must explain its "conclusion that the area in which the

species can no longer live is not a 'significant portion of its range,'" in support of

their challenge to the Service's interpretation.[84]  Both cases cited by Plaintiffs

were decided prior to the publication of the Service's SPR Policy.

The United States Supreme Court has held, "[a] court's prior construction of

a statute trumps an agency construction otherwise entitled to *Chevron*[85] deference

only if the prior court decision holds that its construction follows from the

unambiguous terms of the statute and thus leave no room for agency discretion."[86]

In *Norton*, the Ninth Circuit expressly recognized that the statutory phrase, "in

danger of extinction *throughout* . . . a significant portion of its range'" is

inherently ambiguous.[87]  Therefore, the pre-SPR Policy Ninth Circuit precedent

cited by Plaintiffs is not binding on the Service's interpretation of the ambiguous

phrase "significant portion of its range."  The Service is, and continues to be, free

---

[83] *Tuscon Herpetological Soc'y. v. Salazar,* 566 F.3d 870, 877 (9th Cir. 2009).

[84] *Norton,* 258 F.3d at 1145 (citing *Asarco Inc. v. EPA*, 616 F.2d 1153, 1159 (9th Cir. 1980)).

[85] *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

[86] *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 969 (2005).

[87] *Norton,* 258 F.3d at 1141 (quoting 16 U.S.C. § 1532(6)).

-24-

to publish reasonable and permissible interpretations of this ambiguous statutory language.

Under *Chevron*, a court reviewing an agency interpretation of an ambiguous statutory phrase must examine whether the agency's interpretation is reasonable and "based on a permissible construction of the statute."[88] In justifying its interpretation of "significant portion of its range" under the ESA, the Service explained:

> The context in which Congress used the term ["range'] is
> . . . instructive. In the Act, "range" is used as a
> conceptual and analytical tool related to (1) identifying
> endangered and threatened species under section 4, and
> (2) identifying areas appropriate for the establishment of
> experimental populations. In contrast, the concept of
> "range" plays no direct role in implementation of the key
> operative provisions of the Act that protect species that
> we determine are endangered or threatened.
>
> .    .    .
>
> Once we determine that a species is an
> "endangered species" or "threatened species," the
> protections of the Act are applied to the species itself,
> not the "range" in which it is found. For example,
> sections 7 and 9 of the Act contain no reference to
> "range" and their provisions are applied to the species or
> individuals of the species, rather than a specified
> "range." In other words, as explicitly acknowledged in
> the regulations governing the Lists of Endangered and

---

[88] *Chevron*, 467 U.S. at 843.

Threatened Wildlife and Plants, the protections of the Act are applied "to all individuals of the species, wherever found" (50 CFR 17.11(e), 17.12(e)). As long as a species is listed, these protections apply to all populations and individuals of the species regardless of how that species' range changes over time . . . .

.    .    .

Thus, the term "range" is relevant to whether the Act protects a species, but not how that species is protected. Having concluded that the term "range" is used primarily in determining whether a species qualifies as an endangered species or threatened species, we must still consider its meaning in that context. The Services interpret the term "range" to be the general geographical area within which the species is currently found, including those areas used throughout all or part of the species' life cycle, even if not used on a regular basis. *We consider the "current" range of the species to be the range occupied by the species at the time the Services make a determination under section 4 of the Act.*

*We reach this conclusion based on the text of the Act. As defined in the Act, a species is endangered only if it "is in danger of extinction" throughout all or a significant portion of its range. The phrase "is in danger" denotes a present-tense condition of being at risk of a current or future undesired event. Hence, to say a species "is in danger" in an area where it no longer exists—i.e., in its historical range where it has been extirpated—is inconsistent with common usage. Thus, "range" must mean "current range," not "historical range."*

Some have questioned whether lost historical range may constitute a significant portion of the range of

a species, such that the Services must list the species rangewide because of the extirpation in that portion of the historical range. *We already take into account in our determinations the effects that loss of historical range may have on the current and future viability of the species. We conclude that this consideration is sufficient to account for the effects of loss of historical range when evaluating the current status of the species, and a specific consideration of whether lost historical range constitutes a significant portion of the range is not necessary.* In other words, we do not base a determination to list a species on the status (extirpated) of the species in lost historical range. We base this conclusion on the present tense language of the Act and on the fact that considering the status of the species in its current range is in fact applying the test required by our SPR definition as explained below.

*Given our definition of SPR, we will arrive at the appropriate status conclusion by considering the effects of loss of historical range on the current status of the species even though we do not explicitly consider whether lost historical range is itself an SPR.* In other words, considering the status of the species in its current range is in fact applying exactly the test envisioned by our definition of SPR, with the difference that the scenario is actual rather than hypothetical. Under this policy's definition, we consider whether, under a hypothetical scenario, a species would be endangered or threatened without the portion in question. When we consider the status of a species in its current range, we are considering whether, without that portion (i.e., lost historical range) the species is endangered or threatened. If lost historical range had indeed been an SPR prior to its loss, then, with the loss having occurred, the species should currently be endangered or threatened in its remaining current range. When considering the status of

> a species that has lost historical range, the scenario is no
> longer hypothetical but actual, and the status of the
> remaining portion is no longer hypothetical but is
> determined by examining the species in its current range.
> Thus, we conclude that the appropriate focus of our
> analysis is the status of the species in its current range.[89]

The SPR Policy, as stated, constituted a reasonable interpretation of the

language of the ESA as it relates to a significant portion of a species' range.

Considering loss of historical range when determining a species' current and

future viability, rather than treating historical range as a component of calculating

what constitutes a "significant portion of [a species] range" was appropriate. The

2014 SPR Policy is consistent with the text and purpose of the ESA. It constitutes

a reasonable and permissible reading of an ambiguous statutory phrase. The Court

will defer, as it must, to the Service's interpretation under *Chevron*.

## CONCLUSION

The Service's 2014 Finding that the upper Missouri River Arctic grayling

DPS did not warrant listing under the ESA was reasonable. The conclusion was

based on the best available science, it considered all the appropriate listing factors

as mandated under the ESA, and it made a determination, based on its expertise,

that the current status of the species did not warrant listing. This Court upholds

---

[89] 79 Fed. Reg. at 37,583-84 (July 1, 2014) (Codified at 50 C.F.R. Ch. I) (footnotes omitted) (emphasis added).

the 2014 Finding.

ORDERED:

1.      Plaintiffs' Motion for Summary Judgment[90] is DENIED.

2.      Defendants, S.M.R. Jewell, Daniel M. Ashe and the United States Fish and Wildlife Service's Cross Motion for Summary Judgment[91] is GRANTED.

3.      Intervenor Defendants, State of Montana and Department of Fish, Wildlife and Parks' Cross Motion for Summary Judgment[92] is GRANTED.

4.      The clerk is directed to enter judgment accordingly.

DATED this _2nd_ day of September, 2016.

SAM E. HADDON
United States District Judge

---

[90] Doc. 38.

[91] Doc. 41.

[92] Doc. 45.